## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AGILITY PUBLIC WAREHOUSING COMPANY KSCP,<br>Sulaibiya, Beside Land Customs Clearing Area<br>P.O. Box 25418<br>Safat 13115, Kuwait,<br><br>    *Plaintiff*,<br><br>                 v.<br><br>U.S. DEPARTMENT OF DEFENSE,<br>1400 Defense Pentagon<br>Washington, DC 20301;<br><br>ASHTON B. CARTER, in his official capacity as<br>Secretary of Defense,<br>1400 Defense Pentagon<br>Washington, DC 20301;<br><br>U.S. DEPARTMENT OF THE ARMY,<br>101 Army Pentagon<br>Washington, DC 20310;<br><br>ERIC FANNING, in his official capacity as Secretary of the Army,<br>101 Army Pentagon<br>Washington, DC 20310;<br><br>ARMY CONTRACTING COMMAND – ROCK ISLAND,<br>3055 Rodman Ave.<br>Rock Island, IL 61299-8000;<br><br>ROCK D. WOODSTOCK, in his official capacity as Contracting<br>Officer for the Army Contracting Command – Rock Island,<br>3055 Rodman Ave.<br>Rock Island, IL 61299-8000,<br><br>    *Defendants*. | No. __16-1837____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Agility Public Warehousing Company KSCP ("Agility") files this Complaint for

declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## <u>INTRODUCTION</u>

1.      This is a lawsuit for declaratory and injunctive relief under the Administrative

Procedure Act ("APA").  Agility challenges three sets of agency actions that were arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law, or were taken without observance of procedure required by law.  First, on September 23, 2010, U.S. Army Contracting Officer Rock D. Woodstock unilaterally determined Agility's allowable costs and fees under 13 U.S.-government-funded task orders issued under an umbrella contract awarded by the Coalition Provisional Authority in Iraq ("CPA") in June 2004, shortly before the CPA's dissolution.  In making these unilateral "definitizations," the Contracting Officer determined that the U.S. Government had overpaid Agility and demanded repayment of approximately $80 million.  *See* 48 C.F.R. § 217.7401(b) ("Definitization means the agreement on, or determination of, contract terms, specifications, and price . . . .").  Second, beginning in 2011, the Government collected on its demand by offsetting payments due to Agility under an unrelated contract between Agility and the Defense Distribution Center, a component of the U.S. Department of Defense within the Defense Logistics Agency.  The Government has withheld approximately $17 million owed to Agility under that contract.  Third, on December 15, 2011, the Contracting Officer denied Agility's April 19, 2011 certified claim for approximately $47 million in additional payments from the Government, beyond the payments that Agility had received during its performance of the 13 task orders that the Contracting Officer unilaterally definitized.

2.      Agility files this lawsuit as a protective measure.  Agility's primary contention is that it had a contractual relationship with the U.S. Government and that its dispute with the Government is governed by the Contract Disputes Act ("CDA"), under which the proper forum for the dispute would be the Armed Services Board of Contract Appeals ("ASBCA" or "Board") or the U.S. Court of Federal Claims.  On December 9, 2014, however, the ASBCA dismissed Agility's appeals before the Board because, in the ASBCA's view, Agility's umbrella contract with the CPA was not "made by an 'executive agency' of the United States."  *Agility Logistics*

2

*Services Company KSC*, ASBCA Nos. 57415 et al., 15-1 BCA ¶ 35,840, at 175,266 (Dec. 9, 2014).   Agility has appealed that decision to the U.S. Court of Appeals for the Federal Circuit; that appeal has been stayed while the ASBCA conducts proceedings on remand related to the misnaming of the contractor in Agility's April 19, 2011 certified claim and in the case's caption. *See Agility Logistics Services Company KSC v. Carter*, No. 15-1555 (Fed. Cir.).   Agility has also filed a complaint against the United States in the Court of Federal Claims asserting jurisdiction under the CDA and the Tucker Act; that action has been stayed pending resolution of the Federal Circuit appeal.   *See Agility Public Warehousing Company, K.S.C.P. v. United States*, No. 1:15-cv-00351-SGB (Fed. Cl.).   In case it is ultimately determined that neither the ASBCA nor the Court of Federal Claims has jurisdiction over this dispute, thus leaving Agility with no other adequate remedy, Agility has filed this complaint to preserve its claims under the APA.

3.      Even if Agility did not have a contract with the U.S. Government (and Agility contends that it did), the U.S. military administered the task orders at issue, made payments to Agility from congressionally appropriated funds and increased the value of task orders with the same funding source, audited Agility's invoices, demanded repayment of approximately $80 million of those funds, reviewed and denied Agility's certified claim for approximately $47 million in additional payments, and offset payments due to Agility on an unrelated contract. Those agency actions are subject to the APA.   The Contracting Officer's determination that Agility owed the government approximately $80 million and his denial of Agility's claim for approximately $47 million in additional payments were arbitrary and capricious:   The Contracting Officer accepted without any independent review nearly all the conclusions of a fundamentally flawed audit performed by the Defense Contract Audit Agency ("DCAA") and ignored Agility's extensive documentation in support of its claimed costs and fees, which Agility

set forth in 56 separate letters to the Contracting Officer.  If Agility is denied the opportunity to pursue its claims before the ASBCA and the Court of Federal Claims, this Court should grant relief by setting aside the Contracting Officer's arbitrary and capricious unilateral-definitization determinations and declaring that Agility is entitled to the approximately $47 million sought in its certified claim.  The Court should also issue an injunction (1) barring the Government from collecting on the approximately $80 million it claims it is owed by Agility, (2) ordering the Government to return the approximately $17,221,029.09 that it has already collected by offsetting payments owed to Agility under a separate contract between Agility and the Government, and (3) ordering the Government to pay the approximately $47 million sought in Agility's certified claim.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this APA suit challenging final agency actions of the U.S. Government under 28 U.S.C. § 1331.  It has the authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202; 5 U.S.C. §§ 702-703 and 706(2); and its general equitable powers.

5.      The APA provides a cause of action for parties adversely affected by final agency action when "there is no other adequate remedy in a court."  5 U.S.C. § 704.  As explained above, Agility's primary contention is that it is entitled to seek relief against the U.S. Government based on the facts set forth in this Complaint in either the ASBCA or the Court of Federal Claims.  If, however, that contention is ultimately rejected, an APA suit will be the only adequate remedy available to Agility.  Agility thus files this Complaint as a protective measure to preserve its APA claims.  By filing this Complaint, Agility in no way concedes that the

ASBCA and the Court of Federal Claims lack jurisdiction over its dispute with the U.S. Government.

6.  Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(A).  The defendants are officers or agencies of the United States, and at least Defendants U.S. Department of Defense and Secretary of Defense Ashton B. Carter "reside[]" within this district because a significant amount of the Department's and the Secretary's official duties are performed in this district.  28 U.S.C. § 1391(e)(1)(A).

## PARTIES

7.  Plaintiff Agility Public Warehousing Company KSCP is a logistics company organized under the laws of Kuwait, with its principal place of business located at Sulaibiya, Beside Land Customs Clearing Area, P.O. Box 25418, Safat 13115, Kuwait. As explained below, *see infra* ¶ 14, the contract at issue in this Complaint was awarded to Agility Public Warehousing Company KSCP under its then-current name, the Public Warehousing Company KSC.  The Public Warehousing Company KSC changed its name to Agility Public Warehousing Company K.S.C. on May 25, 2008, and then to Agility Public Warehousing Company KSCP on June 5, 2014.

8.  Defendant U.S. Department of Defense is the agency of the U.S. Government with primary responsibility for providing armed forces.

9.  Defendant Ashton B. Carter is the Secretary of Defense, acting in his official capacity.

10.  Defendant U.S. Department of the Army is one of the three military departments reporting to the Department of Defense.

11.     Defendant Eric Fanning is the Secretary of the Army, acting in his official capacity.

12.     Defendant Army Contracting Command – Rock Island ("ACC-RI") is a contracting center of the U.S. Army Contracting Command located in Rock Island, Illinois.  The U.S. Army Contracting Command is a subordinate command within the Department of the Army's Materiel Command.  It is responsible for contracting in support of the Army and its operations relevant to this cause of action.

13.     Defendant Rock D. Woodstock is a Contracting Officer for the ACC-RI, acting in his official capacity.  Woodstock is the Contracting Officer who unilaterally definitized the task orders at issue and denied Agility's April 19, 2011 certified claim.

## BACKGROUND

### The Contract

14.     The CPA was created in 2003 by the United States, the United Kingdom, and other coalition partners to serve as the temporary governmental authority in Iraq.  On June 6, 2004, the CPA awarded Contract No. DABV01-04-D-0014 ("the Contract") to Agility under its then-current name, the Public Warehousing Company KSC.  The CPA was then dissolved approximately three weeks later on June 28, 2004.

15.     Under the Contract, Agility agreed to provide logistics and warehousing services to support U.S. military forces and U.S. reconstruction efforts in Iraq.

16.     The Contract's performance period was repeatedly extended until the maximum extension date of December 5, 2007, was reached.  Even after that date, Agility continued to perform close-out work until November 5, 2008.

17.    The Contract was initially awarded as an indefinite delivery, indefinite quantity cost-plus-award-fee contract, but was modified in November 2004 to be a cost-plus-fixed-fee contract.  *See* 48 C.F.R. (FAR) § 16.306 ("A cost-plus-fixed-fee contract is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract.").

18.    At the time of award, the Contract stated that it would be funded through the Development Fund for Iraq ("DFI").  The DFI was a bank account established and administered by the CPA and held by the Federal Reserve Bank of New York in the name of the Central Bank of Iraq.  It was composed of surplus funds from the United Nations' "Oil for Food" program; revenue from sales of Iraqi petroleum and natural gas; international donations; and repatriated Iraqi assets.

19.    The Contract was an umbrella contract under which specific supplies or services were ordered through individual "task orders."  All task orders issued under the Contract used Defense Department Form 1155, the U.S. military's "standard document" for "ordering supplies or services through a task order."  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 374 (4th Cir. 2008); *see also* 48 C.F.R. (DFARS) § 216.505(2).

20.    Three task orders were issued before the CPA's dissolution on June 28, 2004. The first two task orders, which are not at issue in this Complaint, obligated DFI funds, as the umbrella contract contemplated.  The task orders at issue in this Complaint (Task Orders 3, 6, 9-12, and 14-20) all provided that they would be funded with appropriations by the U.S. Congress. Accordingly, Agility received periodic payments from U.S.-appropriated funds for its performance under the task orders.  On December 4, 2004, Agility and a U.S. Contracting Officer with the Project and Contracting Office ("PCO"), a component of the U.S. Army, signed

a document formally amending the Contract to delete a provision both requiring use of Iraqi Funds (such as the DFI) and providing that funds from coalition countries would not be obligated under the Contract.

21.     Although the CPA was identified as the issuer of Task Orders 3, 9, and 10, only one of those task orders—Task Order 3—was issued before the CPA dissolved.  Task Orders 6 and 11 identified the PCO as the issuer.  The remaining task orders at issue in this Complaint (Task Orders 12 and 14-20) identified the Joint Contracting Command/Iraq and Afghanistan ("Joint Contracting Command"), also a U.S. Army component, as the issuer.

22.     Throughout Agility's performance of the Contract, contracting authority, management, and administration changed several times, often without formal modification.  The PCO, Joint Contracting Command, Defense Contract Management Agency, United States Army Corps of Engineers Gulf Region Division, and ACC-RI all played administrative or management roles at various points.  This Complaint refers collectively to the U.S. Government agencies that administered and managed the Contract and its task orders or have taken steps to collect on Agility's alleged debt under the Contracting Officer's September 2010 demand letters as the "Government."   No Iraqi Government organization or officer played any administrative or management role with respect to the task orders at issue in this Complaint.

23.     The Contract initially provided that the total value of all supplies and services under the Contract was not to exceed $320,000,000.  U.S. Contracting Officers increased this maximum value to $392,500,000 in June 2007, and to $437,500,000 in December 2007.

24.     The Contract incorporated the Limitation of Funds clause of the Federal Acquisition Regulation ("FAR"), which provided that "the Government is not obligated to

reimburse the Contractor for costs incurred in excess of the total amount allotted by the Government to this contract."  FAR 52.232-22.

25.     The Limitation of Funds clause required Agility to notify the Government when it had reason to believe that, within 60 days, the costs incurred would exceed 75% of the funding allotted to a particular task order.  (The Contract contained a departure from the standard Limitation of Funds clause, in that it required Agility to notify the Government when costs had exceeded 80% of funding.  Contract § 16.1.)

26.     The Limitation of Funds clause provided that the Government would incrementally fund the contract "up to the full estimated cost to the Government specified in the Schedule, exclusive of any fee."  FAR 52.232-22(b).

27.     The Contract incorporated FAR 52.216-7, Allowable Cost and Payment, obligating the Government to reimburse Agility for all allowable costs.

28.     Allowability of costs was determined in accordance with FAR subpart 31.2.

29.     FAR 52.243-2 Changes–Cost Reimbursement was also incorporated into the Contract.

30.     Agility was required to maintain the physical security of the sites and all equipment under Agility's control.  This requirement was limited to "peacetime, non-hostile scenarios."  Contract § 12.1.

31.     FAR 52.239-1, incorporated into the Contract, required the Government and Agility to immediately inform the other party if it knew of "unanticipated threats or hazards" regarding the security situation.

32.     Agility understood from the Government that the U.S. Military would be fully supporting Iraqi reconstruction throughout the Contract period, and Agility based its proposal on this understanding.

33.     The Contract required Agility to hire local Iraqi nationals and Iraqi businesses as subcontractors to the "fullest extent possible."  Contract §§ 15.2.2, 15.3.

34.     Agility began performance with Task Orders 1 and 2 executed on June 17, 2004, which required Agility to establish and operate two distribution center sites in Iraq, at Abu Ghraib near Baghdad and at the Port of Umm Qasr in southern Iraq, as well as satellite locations for both Abu Ghraib and Umm Qasr.

### Task Order 3 (The Transportation Task Order)

35.     On June 19, 2004, the period of performance for Task Order 3 (the "Transportation Task Order") began.  The Transportation Task Order required Agility to provide secure transportation of a variety of items from the Abu Ghraib and Umm Qasr Distribution Center sites to end users located throughout Iraq.

36.     The Transportation Task Order also required Agility to provide convoy security "commensurate with the type of cargo being moved and the threat level."

37.     The Transportation Task Order included contract line item 0204 for reverse logistics and retrograde operations in support of the Multi-National Force-Iraq ("MNF-I")

38.     Costs incurred under the Transportation Task Order included trucking assets and services, convoy security, and Defense Base Act ("DBA") insurance for subcontractor employees.

39.     Armor Group Services Limited ("Armor Group") was Agility's primary subcontractor for convoy security services.  Other subcontractors that intermittently provided

convoy security, particularly when Armor Group could not meet the rapidly increasing requirements of distribution, included Threat Management Group, Falcon Security Company of Iraq ("Falcon"), and Hart GMSSCCO Cyprus Limited ("Hart").

40.     The period of performance for the Transportation Task Order was scheduled to end on June 20, 2005, but it was extended multiple times, sometimes retroactively after the period of performance had ended, and ultimately ended on September 1, 2007.

41.     Throughout the performance of the Transportation Task Order, funding was added by a series of modifications.  The Transportation Task Order had initial funding of $1,750,000.00 and final funding of $182,926,624.31.

42.     The increase in funding was justified as follows:  "The increase in operational throughput necessitated an increase in transportation asset availability and operation.  The increase in throughput also necessitated an increase in convoy security."

43.     To date, Agility has received $182,926,624.31 for services it performed under the Transportation Task Order.

44.     On September 23, 2010, the Contracting Officer unilaterally definitized the Transportation Task Order in the amount of $152,084,162.21 and claimed $30,842,462.10 in overpayments to Agility.

45.     Agility claims entitlement to $9,348,847.03 in additional costs and fees for services performed under the Transportation Task Order for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

### Task Order 6 (The Security Task Order)

46.     Performance under Task Order 6 (the "Security Task Order") began on October 26, 2004.  The task order was executed because the U.S. Government and Agility faced an

immediate need to protect the Abu Ghraib site after the Iraqi Facility Protective Service failed to secure the compound.

47.     Under the Security Task Order, Agility provided perimeter security, entry control point security, explosive detection canine teams, and interior warehouse security at Abu Ghraib. Agility subcontracted this work to the security firm Falcon.

48.     Agility also provided life support, including food and billeting, to site security personnel under the Security Task Order.  Agility subcontracted dining services to Gulf Catering Company, which became an Agility subsidiary about two years after the subcontract was executed.

49.     The period of performance for the Security Task Order was scheduled to end in 12 months, but it was retroactively extended and ultimately ended on September 1, 2007.

50.     The Security Task Order was initially funded with $5,000,000.00, but was increased several times to a final funding of $56,757,125.00.

51.     To date, Agility has received $52,479,340.69 for services it performed under the Security Task Order.

52.     On September 23, 2010, the Contracting Officer unilaterally definitized the Security Task Order in the amount of $15,407,056.66 and claimed $37,072,284.03 in overpayments to Agility.

53.     Agility claims entitlement to $3,149,878.96 in additional costs and fees for services performed under the Security Task Order for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

## Task Order 9 (The Warehouse Task Order)

54.     Task Order 9 (the "Warehouse Task Order") took effect on March 10, 2005. Under the task order, Agility was to continue the services it had been performing under Task Orders 1 and 2 at the Abu Ghraib and Umm Qasr warehouses.

55.     The Warehouse Task Order began with an initial period of performance that was later extended to September 1, 2007.

56.     Warehouse Task Order costs included amounts for warehouse supplies and equipment, office supplies and furniture, IT and telecommunications equipment and services, payroll and administrative services, laundry and sanitation services, dining facility services for warehouse personnel (performed by Gulf Catering Company), salaries, DBA insurance, living accommodations and security for personnel, and personnel travel.

57.     In May 2006, the Warehouse Task Order was modified to include security services at Umm Qasr.

58.     Funding for the Warehouse Task Order was increased several times, beginning with $5,000,000.00 in funding and ending with $53,111,094.00 in funding.

59.     To date, Agility has received $53,111,094.00 for services it performed under the Warehouse Task Order.

60.     On September 23, 2010, the Contracting Officer unilaterally definitized the Warehouse Task Order in the amount of $45,694,207.34 and claimed $7,416,886.66 in overpayments to Agility.

61.     Agility claims entitlement to $18,395,595.61 in additional costs and fees for services performed under the Warehouse Task Order for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

## Task Order 10 (The Khor Az Zubayr Task Order)

62.     Task Order 10 (the "Khor Az Zubayr Task Order"), issued on February 16, 2005, established a satellite operation to the Umm Qasr Port, located at the Port of Khor Az Zubayr. At Khor Az Zubayr, Agility provided warehousing and capabilities to "[r]eceive, accept, account for, hold, repackage, and redistribute equipment and supplies," including customs processing, security for high dollar and sensitive items (i.e., weapons), and providing cargo transfer, reverse logistics, and retrograde operations.

63.     The period of performance for the Khor Az Zubayr Task Order ended on March 31, 2005, but the Government directed Agility to continue work until a follow-on task order was issued on November 21, 2005.

64.     The Khor Az Zubayr Task Order had a total funding of $1,177,076.00.

65.     To date, Agility has received $958,731.65 for services it performed under the Khor Az Zubayr Task Order.

66.     On September 23, 2010, the Contracting Officer unilaterally definitized the Khor Az Zubayr Task Order in the amount of $701,682.61 and claimed $257,049.04 in overpayments to Agility.

67.     Agility claims entitlement to $32,761.77 in additional costs and fees for services performed under the Khor Az Zubayr Task Order for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

## Task Order 11 (The Tadji Task Order)

68.     Task Order 11 (the "Tadji Task Order") provided for the establishment and operation of a mobile warehouse system, including information technology and a small staff, in Tadji, Iraq.

69.     The period of performance for the Tadji Task Order began on April 5, 2005, and was extended until September 1, 2007, with $799,752.00 in obligated funding.

70.     To date, Agility has received $799,752.00 for services it performed under the Tadji Task Order.

71.     On September 23, 2010, the Contracting Officer unilaterally definitized the Tadji Task Order in the amount of $781,705.44 and claimed $18,046.56 in overpayments to Agility.

72.     Agility claims entitlement to $294,513.14 in additional costs and fees for services performed under the Tadji Task Order for which it has not been reimbursed due to the unilateral definitization of the Contracting Officer.

<u>Task Order 12</u>

73.     Task Order 12 was issued specifically to continue the Khor Az Zubayr Task Order.  *See supra* ¶ 62.  Task Order 12 also included the shutdown of Khor Az Zubayr operations, with a period of performance that began on November 21, 2005, and extended through December 31, 2006.  The funding amount for Task Order 12 was $1,000,000.00 when executed, and several modifications increased the funding to $3,593,237.35.

74.     To date, Agility has received $3,077,858.23 for services it performed under Task Order 12.

75.      On September 23, 2010, the Contracting Officer unilaterally definitized Task Order 12 in the amount of $2,947,794.54 and claimed $130,063.69 in overpayments to Agility.

76.     Agility claims entitlement to $1,112,497.14 in additional costs and fees for services performed under Task Order 12 for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

<u>Task Order 14</u>

77.     On June 15, 2006, the period of performance for Task Order 14 began.  That task order required Agility to refurbish part of an Abu Ghraib facility into a living space for approximately 200 people.  The period of performance for Task Order 14 ended on August 15, 2006, with $300,401.00 in funding.

78.     To date, Agility has received $224,356.39 for services it performed under Task Order 14.

79.      On September 23, 2010, the Contracting Officer unilaterally definitized Task Order 14 in the amount of $193,469.42 and claimed $30,886.97 in overpayments to Agility.

80.     Agility claims entitlement to $41,161.99 in additional costs and fees for services performed under Task Order 14 for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

<u>Task Orders 15-18</u>

81.     On June 6, 2007, the period of performance for Task Orders 15-18 began.  These were all follow-on task orders as described below.

82.     Task Order 15 continued the work under the Transportation Task Order and initially had $20,797,686.00 in funding.  *See supra* ¶ 35.  After multiple modifications to extend the period of performance, Task Order 15 ended on December 5, 2007.  On January 8, 2008, Task Order 15 funding was increased to a final amount of $38,714,852.00.

83.     To date, Agility has received $36,183,463.69 for services it performed under Task Order 15.

84.     On September 23, 2010, the Contracting Officer unilaterally definitized Task Order 15 in the amount of $34,588,878.00 and claimed $1,594,585.69 in overpayments to Agility.

85.     Agility claims entitlement to $1,522,936.95 in additional costs and fees for services performed under Task Order 15 for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

86.     Task Order 16 was for follow-on work for the Tadji Task Order.  *See supra* ¶ 68. The period of performance for this follow-on task order ended on December 5, 2007, with $191,351.26 in funding, after multiple funding increases.

87.     To date, Agility has received $191,351.26 for services it performed under the follow-on Tadji Task Order.

88.     An ACC-RI cost analysis recommended definitizing Task Order 16 in the amount of $210,676.67.

89.     On September 23, 2010, the Contracting Officer unilaterally definitized Task Order 16 in the amount of $191,351.26.

90.     Agility claims entitlement to $66,304.31 in additional costs and fees for services performed under Task Order 16 for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

91.     Task Order 17 continued the Warehouse Task Order.  *See supra* ¶ 54.  The period of performance for Task Order 17, originally set to end on September 5, 2007, was extended to December 5, 2007.  Funding was initially obligated in the amount of $9,254,992.00, but it was increased multiple times to a final funding amount of $18,515,234.26.

92.     To date, Agility has received $18,515,234.26 for services it performed under Task Order 17.

93.     On September 23, 2010, the Contracting Officer unilaterally definitized Task Order 17 in the amount of $17,817,256.01 and claimed $697,978.25 in overpayments to Agility.

94.     Agility claims entitlement to $8,623,969.48 in additional costs and fees for services performed under Task Order 17 for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

95.     Task Order 18 continued the Security Task Order and added security for the Umm Qasr Port.  *See supra* ¶ 46.  The period of performance was initially set to end on September 5, 2007, but was extended to December 5, 2007.

96.     The initial obligation for Task Order 18 was $4,176,121.00 in funding, but after the period of performance ended, funding was increased to the final amount of $6,960,201.26.

97.     To date, Agility has received $5,827,883.86 for services it performed under Task Order 18.

98.     On September 23, 2010, the Contracting Officer unilaterally definitized Task Order 18 in the amount of $4,187,672.13 and claimed $1,640,211.73 in overpayments to Agility.

99.     Agility claims entitlement to $132,239.40 in additional costs and fees for services performed under Task Order 18 for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

Task Order 19 (The Retrograde Task Order)

100.     On June 26, 2007, performance of Task Order 19 (the "Retrograde Task Order") began, which continued the performance of contract line item number 0204 of the Transportation

Task Order. *See supra* ¶¶ 35, 37.  Under the Retrograde Task Order, Agility provided reverse logistics and retrograde operations in support of MNF-I requirements.

101.    The period of performance for the Retrograde Task Order ended on December 5, 2007, after multiple extensions.  The funding for the Retrograde Task Order, initially set at $946,000.00, was increased multiple times.  By the end of performance, the Retrograde Task Order had $8,114,720.00 in total funding.

102.    To date, Agility has received $3,278,189.22 for services it performed under the Retrograde Task Order.

103.    On September 23, 2010, the Contracting Officer unilaterally definitized the Retrograde Task Order in the amount of $2,370,831.11 and claimed $907,358.11 in overpayments to Agility.

104.    Agility claims entitlement to $87,602.77 in additional costs and fees for services performed under the Retrograde Task Order for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

### Task Order 20 (The Closeout Task Order)

105.    On December 4, 2007, Task Order 20 (the "Closeout Task Order") was executed. The Closeout Task Order consolidated the work under the Transportation, Warehouse, Security and Retrograde Task Orders, all of which had expired on December 5, 2007.

106.    The Closeout Task Order operated on a month-to-month basis—i.e., the Government was to notify Agility each month if it desired services for the following month.  In addition to the follow-on work, the Closeout Task Order required Agility to provide transition support to the successor contractor and convert all its files generated under the Contract from paper to digital.

107.     The period of performance for the Closeout Task Order ended on November 5, 2008.  The Closeout Task Order initially had funding obligated in the amount of $3,458,222.88, which was increased through several modifications to $28,929,517.04.

108.     To date, Agility has received $28,647,664.79 for services it performed under the Closeout Task Order.

109.     On September 23, 2010, the Contracting Officer unilaterally definitized the Closeout Task Order in the amount of $28,425,172.00 and claimed $222,492.79 in overpayments to Agility.

110.     Agility claims entitlement to $4,387,924.43 in additional costs and fees for services performed under the Closeout Task Order for which it has not been reimbursed due to the unilateral definitization by the Contracting Officer.

<u>Performing in a War Zone</u>

111.     The Contract was awarded to Agility because it possessed the requisite logistics expertise to handle the work.

112.     Agility was the sole contractor tasked with providing its own security and working outside of the International Zone or "Green Zone" in Baghdad.  The U.S. military controlled entrance into the heavily-fortified Green Zone.  Outside of the Green Zone, however, violent insurgents operated freely, especially in the early years of the war.

113.     Soon after Agility began performance of the task orders, it learned that the security situation in Iraq had become much worse than Agility could have anticipated—and far worse than what had been disclosed to Agility by the U.S. Government.  As the United States and Coalition forces ceded areas near Agility facilities to the control of local Iraqi military and

police, the security situation deteriorated.   The Agility personnel at the Abu Ghraib warehouse lived and worked under a constant barrage of insurgent mortar attacks.

114.    Insurgents began to specifically target Agility local national employees, vendors, facilities, and convoys, often with deadly consequences.   Several Agility personnel were kidnapped and murdered.  Many reported that they were stalked and that their families were threatened.

115.    In one stretch between November 26, 2005, and March 22, 2006, insurgent attacks in the vicinity of Agility's Abu Ghraib warehouse became so violent that 25 Agility and subcontractor personnel were killed and 50 were wounded.  There were so many casualties from the open insurgent warfare that it was necessary to set up a trauma center inside the Abu Ghraib compound.

116.    Since conditions were too dangerous for them to go home after work, the local Iraqi employees of Agility stayed inside the Abu Ghraib compound, and they were forced to barricade themselves from the bloodshed outside.

117.    Due to the security situation at Abu Ghraib, DCAA refused to conduct on-site audits during part of 2005.

118.    Iraqi nationals employed at Abu Ghraib began quitting in droves in November 2005, due to fears of the horrific attacks.  By March 2006, Agility struggled to find and recruit skilled workers and certain subcontractor services at Abu Ghraib due to its reputation for violence.

119.    By 2006, the security situation at the Umm Qasr Port also began to deteriorate. At least one subcontractor requested a change in the scope of work to its contract to remove its employees from the Abu Ghraib and Umm Qasr sites.

120.    In April 2006, Agility pleaded with the Government to approve costs for increased security for convoys, and security to protect its local national employees.   The Government instructed Agility to use alternate routes for the convoys, when in fact there were *no* safe routes around the Abu Ghraib compound.   Regarding the local national employees, the Government considered them to be on their own, and refused to provide any protection for them.

121.    The Government eventually approved security upgrades to protect Agility employees, subcontractors, and Government property.   Despite these precautions, Agility equipment was damaged or destroyed and personnel continued to be attacked and killed by insurgents.

122.    The dangerous working environment and the chaos of war posed substantial challenges for Agility in documenting and calculating all of its expenditures in an efficient and timely manner.

123.    Agility undertook competition for its subcontracted work to the extent possible, but the exigent circumstances made it difficult, if not impossible, to engage in full and open competition in some cases and for some services.

124.    The Government was regularly involved in Agility's procurement decisions and expressly approved Agility's major subcontracts.

125.    Contracting Officers expressly approved subcontracts in which Agility selected higher-priced bidders that provided the best value to the Government.

126.    As was the custom in the region and due to the lack of banking infrastructure, Agility had to pay many of its subcontractors and vendors in cash—a method known to and approved by the Government.

22

127.    When vendors agreed to invoice Agility, their invoices were frequently delayed. It sometimes took as long as a year for subcontractors to bill Agility.

<div align="center">Government Oversight of Agility Performance</div>

128.    The Logistics division of the PCO (which was later taken over by the United States Army Corps of Engineers Gulf Region Division) managed the operations of the Contract and was headed by John "Jack" Holly in the Green Zone in Baghdad.

129.    Holly held daily operational meetings attended by PCO Logistics personnel, Contracting Officer Representatives ("CORs"), and Agility personnel.

130.    CORs, selected by Holly, were located in the Green Zone, as well as at the Abu Ghraib and Umm Qasr sites.

131.    The Contracting Officers were also located in the Green Zone in Baghdad. The Contracting Officers did not attend Holly's operational meetings.

132.    The Contracting Officers rarely, if ever, visited the Abu Ghraib, Umm Qasr, Khor Az Zubayr, or Tadji sites.

133.    There were frequent changes in Government agencies managing the Contract and high turnover of Contracting Officers and CORs assigned to administer the Contract. The Contracting Officers were assigned to multiple contracts and lacked the time and resources to engage fully with Agility.

134.    Some of the Contracting Officers and CORs lacked experience administering cost-reimbursement contracts, and Agility spent valuable time and effort training and establishing a close working relationship with every new Contracting Officer and COR.

135.    Throughout Agility's performance of the task orders, which by necessity adapted to and supported the Government's fluid and ever-changing military needs in a war zone, the Government made requests that required immediate action.

136.    Continuous, uninterrupted performance of the task orders was essential to the Government's reconstruction mission.   As the Joint Contracting Command explained in justifying an increase of the Contract's maximum value, any stoppage of work "would have a catastrophic impact" because "[e]verything that helps build Iraq would be shut down as the result of a work stoppage."

137.    There was often no time to deal with funding issues before a task was performed. Costs ramped up quickly with the pace of work and increased security risks.

138.    In several instances, Agility was not aware that funding would be exceeded until the funds were exhausted, even after a task-order performance period had ended.   Agility accountants sometimes received final bills from its subcontractors and finalized accounts months after task orders ended.  These overruns were not foreseeable, making it impossible for Agility to give notice to the Government.

139.    To the extent it did foresee overruns, Agility submitted notifications to the Contracting Officer when it expected costs to exceed 75% of the funding obligated to each task order.  Agility also sent monthly "burn reports" to the Government throughout its performance. These "burn reports" listed for each task order the costs incurred, the funding amount remaining, and the percentage of funding remaining.

140.    In response to Agility's funding notifications, the Government directed Agility to continue work (which Agility did), knowing that Agility's costs had already exceeded funding limits.   For instance, in 2005, after Agility notified the Contracting Officer that costs had

exceeded 75% of the funding limits of the Transportation and Security Task Orders, the Contracting Officer gave Agility "direction to continue" with the promise that funding would be increased.

141.    Indeed, months later the Government added funds to the Transportation and Security Task Orders.  The Government frequently and routinely increased funding limits to accommodate costs that Agility had already incurred.

142.    After the funding was exhausted on a particular task order, Agility continued to invoice the Government for services rendered.  Invoices against an under-funded task order noted that the funding was exhausted.  Agility submitted these invoices to additionally inform the Government of Agility's incurred costs.

143.    The Government's administrative process for adding funding could not and did not keep pace with the rapidly increasing costs.  The Government consistently stated its expectation that Agility continue to support the war effort, and gave assurance that Agility would be paid for the work it was directed to perform.

144.    In addition, the Government sometimes added funds and retroactively extended periods of performance after the periods of performance had already ended.

145.    At no point during performance of the task orders, including after notification of an impending exhaustion of funds, did a Contracting Officer or any other Government personnel direct Agility to stop working.

146.    Agility on-site employees received positive feedback from the Government personnel with whom they worked, even after the cost ceilings on task orders were exceeded.

147.    Agility continually improved its experience working under a cost-reimbursement contract and accordingly improved its cost controls.  Agility continued to add more government

contracts professionals to its staff to communicate with the Contracting Officers and ensure compliance with the Contract and the FAR.   By 2007, Agility had implemented a new accounting system, Deltek, which is commonly used by government contractors.

148.   The Contracting Officers occasionally expressed dissatisfaction with the level of costs reflected in invoices and would sometimes request that Agility rework the numbers to provide greater discounts to the Government.   Agility generally complied with the Government's requests, even when it disagreed with the Government's assertions.

<u>Unilateral Definitization of the Task Orders and Subsequent Offsets</u>

149.   Agility made good faith efforts to definitize the task orders in a timely manner. Agility submitted several rounds of definitization proposals between December 2006 and March 2009.  Each submission was either rejected by the Government for alleged deficiencies or never acknowledged by the Government.

150.   Agility attempted to implement regularly scheduled meetings with the Contracting Officers to discuss cost issues and definitization proposals throughout performance of the task orders.  These attempts were for the most part met with resistance by the Government.

151.   The 2004, 2005, and 2006 provisional indirect rates were not determined until March 2007, the 2007 rates until May 2008, and the 2008 rates until December 2009. Furthermore, to date only the 2004 and 2005 indirect rates have been finalized, and the 2006 to 2010 indirect rates remain provisional.

152.   On December 7, 2008, contracting authority for the Contract was transferred to ACC-RI.

153.   Agility submitted definitization proposals for all of the task orders to ACC-RI in early 2009.

154.     DCAA audited Agility's 2009 definitization proposals and issued audit reports between May and August 2009.  Between July and October 2009, ACC-RI prepared memoranda documenting their recommended positions on the proposals.   Those memoranda largely incorporated the findings from DCAA's audit reports.

155.     In November 2009, a team of Agility personnel traveled to Rock Island to negotiate definitization with ACC-RI.  Despite Agility's attempts to negotiate, little progress was made during these discussions.

156.     Agility received access to DCAA audit reports and corresponding ACC-RI memoranda regarding its definitization proposals in February 2010.  It was clear upon review of these documents that they were issued by Government personnel who knew little about what happened, why it happened, or how it happened.   DCAA's reports and ACC-RI's memoranda included flawed analysis that was inconsistent with the FAR and Defense Federal Acquisition Regulation Supplement ("DFARS") and that failed to take into account the war environment in which Agility had performed the Contract.

157.     In a letter providing the reports and memoranda to Agility, the Contracting Officer stated that he intended to provide an "opportunity to comment before a decision is made" to unilaterally definitize the undefinitized task orders.

158.     Once Agility had an opportunity to review the reports and memoranda, Agility expended a great deal of effort and resources to demonstrate to the Contracting Officer that the costs questioned by the Government were allowable and supported by documentation.

159.     Between March and September 2010, Agility submitted 56 separate letters to the Contracting Officer justifying the costs questioned in the ACC-RI memoranda, supported by vouchers, receipts, procurement files, and other documentation.

160.    ACC-RI questioned $68,197,642.82 in specific direct costs.  It also recommended disallowing certain indirect costs and fees.

161.    Agility provided documentation in its 56 letters supporting nearly all the questioned direct costs.   In addition, Agility's letters to the Contracting Officer provided arguments, explanations, and calculations refuting the Government's erroneous conclusions regarding funding, allocability, decrements, and fees.

162.    On September 23, 2010, Contracting Officer Rock D. Woodstock issued thirteen final decisions, unilaterally definitizing Task Orders 3, 6, 9-12, and 14-20.   Except for Task Order 16, the Contracting Officer definitized the task orders in the exact amount recommended in the ACC-RI memoranda, making it apparent that the Contracting Officer made no independent analysis of the costs and simply adopted the recommendations in their entirety.   The Contracting Officer definitized Task Order 16 in an amount even *less* than the ACC-RI memoranda recommended.  *See supra* ¶¶ 88-89.

163.    In definitizing the task orders and demanding repayments from Agility, the Contracting Officer ignored the documentation provided by Agility in its 56 letters and disregarded the expressly stated purpose of the ACC-RI memoranda, which was to recommend a "basis to *begin negotiation* of a fair and reasonable price for this effort" (emphasis added).

164.    The Contracting Officer's final decisions definitized the price of each task order at amounts significantly lower than Agility's allowable costs and fees, most of which had already been paid by the Government.   In effect, the Government demands that Agility repay millions of dollars for well-documented, allowable costs incurred by Agility in its good faith support of the Government's military efforts in Iraq.

165.    Although Agility agrees with a small portion of the Contracting Officer's disallowances, $79,595,242.10 of the Government's $80,830,305.62 overpayment claim against Agility is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and was undertaken without observance of procedure required by law.

166.    In the task-order modifications implementing the Contracting Officer's unilateral-definitization decisions, the Contracting Officer erroneously referred to the contractor as "Agility DGS Logistics Services Company KSC(C)," and the Contracting Officer's final decision letters demanding repayments were erroneously addressed to "Agility Defense and Government Services KSC," even though no entity with that name exists.  Despite these errors, the contractor remained the entity formerly known as the Public Warehousing Company KSC.

167.    In July 2011, the Government provided notice that the Government's claims under the task orders at issue were "being loaded into the Treasury Offset Program for collection."  The alleged debt was entered into the Treasury Offset Program under the name "Agility DBA Public Warehousing Company KSC."  To date, the Government has collected approximately $17,221,029.09 of its claimed overpayments to Agility by offsetting payments owed to Agility under a separate contract (Contract No. SP3100-05-C-0020, "the DDKS Contract") between Agility and the Defense Distribution Center, a component of the Department of Defense within the Defense Logistics Agency.  These actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and were undertaken without observance of procedure required by law.

<u>Agility's Certified Claim</u>

168.    On April 19, 2011, Agility submitted to the Contracting Officer a certified claim for additional payments under the task orders at issue in this Complaint.  The claim correctly

stated that it was being submitted on behalf of the entity formerly known as the Public Warehousing Company KSC, but the claim misidentified that entity's then-current name as "Agility Logistics Services Company KSC."

169.    Although the claim sought $47,196,205.98 in additional payments, that figure was based on the understanding that the Government had already paid Agility $386,221,571.35 under the task orders at issue.   The actual amount of the Government's payments, however, was $386,221,544.35.   Because this immaterial $27 discrepancy was clear from the face of the claim and the Government's own records, this Complaint seeks relief based on the correct claim amount of $47,196,232.98.

170.    Contracting Officer Rock D. Woodstock denied Agility's claim on December 15, 2011.   In his denial letter, the Contracting Officer asserted that Agility's claim was "simply a repetition of the matters" before the ASBCA in Agility's appeals of the Contracting Officer's September 23, 2010 unilateral-definitization decisions.

## Security Subcontracts Questioned by the Government

171.    The largest category of costs in the Government's claim is based on the premise that Agility did not choose the lowest-priced offeror in selecting three of its security providers: Falcon, Armor Group, and Hart.   By disallowing these costs, the Government in effect changed the rules, demanding after the fact that Agility invoice only the amount offered by the lowest priced offeror, when, as the Government understood, Agility was appropriately selecting the best value to the Government.

172.    Whenever possible, Agility conducted competitive procurements and selected subcontractors based on best value.   The Government knew and approved of Agility's best value source selection method.

173.    ACC-RI questioned and the Contracting Officer disallowed $35,651,305.75 in payments to Agility subcontractor Falcon under the Security, Warehouse, and Transportation Task Orders.  *See supra* ¶¶ 38, 47, 56.  The disallowances were based on multiple allegations of lack of competition and lack of supporting documentation.

174.    First, ACC-RI questioned all Falcon costs prior to November 2005 on the basis that there was no subcontract covering that period.

175.    However, Agility and Falcon operated under a letter contract from November 2004 to November 2005.  The Contracting Officer expressly approved this agreement.

176.    When the letter contract expired in November 2005, Agility issued a request for proposal for site security services and selected Falcon to continue the work.  Hart was the lowest bidder.  ACC-RI questioned Falcon's costs on the basis that Agility should have instead selected Hart as the lowest-priced offeror.

177.    Hart's previous performance as a convoy security provider for Agility under a Transportation Task Order subcontract in 2005 was abysmal.  Agility had reason to believe that Hart personnel *facilitated an insurgent ambush on a PCO convoy*.  In addition, Hart personnel were known to Agility to extort convoys for protection money.

178.    By contrast, Falcon had extensive security experience and had performed well during its initial year at Abu Ghraib.  Indeed, the Government preferred Falcon over all other firms as a security provider at Abu Ghraib.

179.    ACC-RI additionally questioned Falcon costs for insufficient detail on some Falcon invoices and possible duplication of costs under the Transportation, Security, and Warehouse Task Orders.  In response, Agility provided itemized Falcon invoices detailing the questioned costs to the Contracting Officer.

180.    Regarding Armor Group, ACC-RI questioned and the Contracting Officer disallowed $6,039,766.56 under the Transportation Task Order on the basis that Agility should have selected the firm Universal instead of Armor Group.  This disallowance was based solely on the fact that Universal was the lowest-priced offeror.  (ACC-RI also questioned an Armor Group invoice that appeared to be duplicated in Agility's definitization proposal.  Agility agreed with ACC-RI on this issue, and that amount is excluded from Agility's claims in this Complaint.)

181.    As Agility explained in its correspondence to the Contracting Officer, Universal had only been in business for one year and lacked experience to operate in a highly dangerous region.  Its vague, five-page proposal failed to include Standard Operating Procedures or details related to its convoy configuration, both required by the request for proposal.  Universal's proposed price was so low that it demonstrated a fundamental misunderstanding of the complex, dangerous requirements of convoy security.  Therefore, Agility reasonably excluded Universal from the competition.

182.    Agility selected Armor Group over the seven other offerors in the competition.  Armor Group was the lowest-priced, technically acceptable offeror and provided the best value to the Government in the competition questioned by ACC-RI.

183.    For Hart, Agility's convoy security provider before Armor Group, the Contracting Officer disallowed $14,081,965.00.  This constitutes the entire amount for Hart's 2005 convoy security services under the Transportation Task Order.  ACC-RI questioned Hart's costs on the basis that the procurement file "lacked some critical documents" and invoices did not have sufficient detail to support the costs claimed.

184.    The procurement file documenting the rationale for selecting Hart is lost at this time.  Therefore, Agility analyzed the reasonableness of Hart's price by comparing it to prices

offered in a competition for a similar convoy security subcontract. This analysis showed that Hart's price per security team per day was lower than all the offers in the similar procurement.

185.    In addition, Agility provided over 400 pages of itemized Hart invoices and corresponding Agility payment vouchers in response to the Government's claim that the supporting documentation lacked detail.

<div align="center">Other Disallowed Items</div>

<div align="center">*DBA Insurance Costs*</div>

186.    ACC-RI concluded that Agility's DBA insurance expenses were excessive, and the Contracting Officer disallowed $3,559,314.58 on the basis that DBA rates were not divided between hazardous and nonhazardous personnel.

187.    The Contract required Agility to procure DBA insurance for its personnel and subcontractor personnel. Agility allocated DBA costs, calculated as a percentage of payroll and subcontract labor costs, to the Transportation and Warehouse Task Orders. Due to the functions performed by Agility and subcontractor employees operating in Iraq, all employees were classified as hazardous for DBA purposes. This was essential to provide sufficient disability compensation and medical treatment to injured workers, and to compensate the families of employees who were killed during the performance of the Contract.

188.    ACC-RI also questioned Agility's reimbursement of its subcontractors' DBA insurance costs because there appeared to be no subcontract labor under the Transportation Task Orders. Agility had mistakenly labeled subcontracts in the Transportation Task Orders as "Non Labor," when in fact they were very labor-intensive. Agility corrected this mistake in its letters to the Contracting Officer.

*Dining Costs*

189.    ACC-RI questioned $1,181,028.79 in dining costs at Abu Ghraib and Umm Qasr that Agility provided through its subcontractor, Gulf Catering Company.  Agility allocated these costs to the Warehouse and Security Task Orders, as well as the Closeout Task Order.  *See supra* ¶¶ 48, 56.

190.    In concluding that Agility's catering costs were excessive, ACC-RI conflated catering costs at the Umm Qasr site with costs at the Abu Ghraib site.  The costs at the two sites differed significantly due to different rates and headcounts.  The rate charged at Abu Ghraib was higher than at Umm Qasr because the Abu Ghraib cost included the construction and maintenance of a secure dining facility to protect personnel from mortar fire.

191.    In addition, ACC-RI pro-rated amounts that Agility had already pro-rated in its definitization proposals.  Agility pointed out ACC-RI's errors and provided documentation supporting its allowable catering costs in its letters to the Contracting Officer.

192.    Agility recalculated its catering costs using the method applied by DCAA and adopted by ACC-RI, which calculated rates per meal rather than rates per day.  This method actually increased Agility's catering costs by $446,819.84, which is included as part of Agility's claims in this Complaint.

193.    Agility agrees with the Contracting Officer's disallowance of $37,789.50 for an erroneously duplicated invoice; that amount is excluded from Agility's claims in this Complaint.

*Service Terminal Indemnity Costs*

194.    ACC-RI questioned $620,517.00 for costs incurred under the Warehouse and Closeout Task Orders for Agility's costs required to comply with Kuwaiti labor laws.  ACC-RI assumed that Agility personnel were not covered under Kuwaiti labor laws, which mandate that

companies cover all employees that have Kuwaiti residency permits with Service Terminal Indemnity.

195.    Service Terminal Indemnity costs were necessary for Agility's business.  Agility employees, although they worked in Iraq, obtained Kuwaiti residency permits.  Agility employees were in-processed through Agility's Kuwait offices, established Kuwait bank accounts, and were paid in Kuwaiti dinars through Agility's Kuwait payroll.  Agility's compliance with Kuwaiti labor laws was subject to review by Kuwait's Finance Ministry.

*Costs that Appeared to be Duplicates*

196.    ACC-RI questioned $258,639.25 in subcontractor payments due to possible duplication of costs.  However, with one exception that Agility has excluded from its claims in this Complaint, these were not duplicated costs.  Costs under the Warehouse Task Orders were sometimes allocated evenly between two contract line item numbers—one for the operation of Abu Ghraib and one for the operation of Umm Qasr.  This, along with some installment payments made to subcontractors (e.g., monthly lease payments), gave the appearance of possible duplicative costs.

*Fuel Costs*

197.    The Contracting Officer disallowed $174,000.00 under the Warehouse Task Order in fuel costs based on ACC-RI's conclusion that Agility had purchased the same quantity of fuel at different rates per liter.  These purchases were, in actuality, for two different quantities (100,000 liters and 190,000 liters) that were purchased at the same rate per liter.

*Requests for Specificity*

198.    ACC-RI questioned several line items on the basis that the documentation was insufficient or that the description of the cost was "too vague" or "missing detail."  Agility

provided additional documentation verifying that the charges were allowable, including itemized invoices and payment vouchers in the amount of $1,506,909.03.

*Trucking Costs*

199.    The Contracting Officer disallowed $440,850.00, the entire amount paid to Agility vendor Al-Sa'aa, because ACC-RI concluded that Al-Sa'aa did not "sound like a vendor name."   The Contracting Officer disallowed these costs even after Agility explained that Al-Sa'aa Bureau of Transportation was an Agility trucking vendor under the Transportation Task Order.  Al-Sa'aa is the phonetic translation of the trucking company's Arabic name.

*Costs for Wooden Pallets*

200.    ACC-RI questioned $11,900.00 in costs for wooden pallets because Agility did not pay the same amount each time it purchased wooden pallets.   Agility purchased wooden pallets for the Abu Ghraib warehouse from the Al Nabel Company for General Contracting Limited.   Agility had to pay varying prices for pallets at different times in the fluctuating, unstable economy of Iraq during the war.  For example, lower-priced pallets may have been out of stock, unavailable for delivery within required timeframes, or of unacceptable quality.

*Personnel Recruiting Costs*

201.    ACC-RI questioned costs for a recruiting firm to find a highly skilled IT manager to work on-site in Iraq.  Agility paid the recruiting firm $22,000.00, 20% of the employee's annual salary.  In addition to the employee's salary slip, vendor invoice, and Agility payment voucher, Agility submitted to the Contracting Officer articles from business journals stating that the standard rate charged by recruiters is 20% to 35% of the employee's annual salary.   The Contracting Officer still disallowed this entire amount, even though recruiting costs are

allowable under FAR 31.205-34(a)(6), which allows costs "for employment agencies, not in excess of standard commercial rates."

*Iraqi Republic Railways*

202.    The Contracting Officer disallowed $32,000.00 for a payment made to Iraqi Republic Railways ("IRR"), the entire cost incurred by Agility under the IRR subcontract.  ACC-RI questioned the cost because Agility utilized IRR only once.  As Agility established in its responses to ACC-RI's questions, the Government in 2007 provided express approval of the sole-sourced IRR subcontract.  IRR was owned by the Iraqi Government and was the only vendor that provided rail services in Iraq.  After utilizing IRR, Agility determined that rail transportation was unreliable and unsafe due to repeated insurgent attacks, rampant theft during transport and at the railway yard, and long periods when the rail was not operational. Accordingly, Agility abandoned further use of the rails.

*Petty Cash*

203.    Finally, ACC-RI questioned $498,797.74 in petty cash expenses.  In response, Agility provided documentation detailing the purchases and showing that the costs were reasonable.  In Iraq during performance of the Contract, banking infrastructure was either not available or not safe for contractors, and many vendors would only do business when paid in cash.  As a result, Agility had to pay a substantial amount of costs in cash.  The Government knew that this was a common practice in this region and approved of this payment method.

<u>Decrements Applied to Unaudited "Smaller" Task Orders</u>

204.    DCAA did not audit the seven smaller task orders (i.e., 10, 11, 12, 14, 16, 18 and 19) to the same extent it audited the larger task orders (i.e., 3, 6, 9, 15, 17 and 20).  Rather,

DCAA applied decrements to the smaller task orders based on its unsupportable conclusions on the larger task orders.

205.    The Government calculated and applied these decrements before providing Agility any opportunity to respond to the questioned costs and fees on the larger task orders.

206.    A decrement factor of 27.21% was applied to proposed costs, and a 53% decrement factor was applied to proposed fees, resulting in a recommended decrease of $4,527,607.97 to Agility's definitization proposals for the smaller task orders.  ACC-RI adopted DCAA's decrements, and the Contracting Officer demanded repayment of $2,983,616.10.

<div align="center">Periods of Performance</div>

207.    ACC-RI questioned all costs Agility incurred outside the periods of performance of the task orders.

208.    There was significant overlap in the work involved under the task orders, especially those task orders that simply continued the work of previous task orders.  In some cases, Agility inadvertently charged costs to the wrong task order (e.g., Agility continued to charge against the Warehouse Task Order when it should have charged against the Closeout Task Order).  Agility's 2010 letters showed that these incurred costs, while allocable to a different task order, are allowable and allocable to the Contract.

209.    The Government's delay in definitizing the task orders forced Agility to close out task orders following the end of the periods of performance, thereby constructively extending the periods of performance.  For example, the 2004 indirect rates were not finalized until after Agility's first round of definitization proposals, and indirect rates going as far back as 2006 have yet to be finalized.  *See supra* ¶ 151.  Therefore, Agility had to "correct" (i.e., update) the rates accordingly in its subsequent rounds of definitization proposals.  In addition, to maintain current

cost data as required by the FAR, Agility had to update its proposals with additional costs incurred in the interim.

210.    As a result, Agility incurred labor costs after the end of the period of performance for the task orders in order to update and finalize its definitization proposals.  Agility's claims in this Complaint include these costs.

<u>Fee Calculations</u>

211.    Before unilateral definitization in September 2010, the task orders were undefinitized contract actions with undefinitized fixed fees.

212.    Agility and the Government contemplated that the fee amount would be negotiated upon definitization of the task orders.

213.    To assess the appropriate fees it is owed, Agility applied the weighted guidelines method contemplated by 48 C.F.R. (DFARS) § 215.404-71.  In its assessment, Agility derived a conservative fee amount by not considering costs it reasonably could have considered for land, buildings, facilities, working capital and Facilities Capital Cost of Money (which Agility did not waive) under the weighted guidelines method.  Furthermore, in utilizing values only one level above normal for technical and management risk, Agility undervalued the difficulty in properly estimating costs, as well as the casualties and other performance risks of working in a war zone with non-military security.  Even with these conservative calculations, Agility determined a Profit Objective rate of 7%.  (If Agility had incorporated the additional costs and risk mentioned above as permitted by the weighted guidelines, the fee objective would be 8-10%.)   Agility's claims in this Complaint are based on applying the 7% fee to direct and indirect costs in its 2011 definitization proposals.

214.    The Government, on the other hand, calculated a fee amount using a method which has no support in the FAR or DFARS.   Rather, ACC-RI applied a 5% fee to a base amount far below Agility's allowable costs for performing the task orders.   ACC-RI's fee calculations *ignored Government-issued increases in funding*, and in some cases *applied the fee to amounts far below the Government's own recommended costs*.

215.    The Government's calculations resulted in a decrease of $10,280,834.71 in Agility's 2009 proposed fees for the larger task orders (i.e., 3, 6, 9, 15, 17, and 20).   This is based on the assumption that all the questioned costs would be disallowed, without considering any of Agility's 56 letters.

216.    To determine the base amounts, ACC-RI first calculated a "fee pool" for each of the task orders.   ACC-RI started with the initial Not-to-Exceed amount on a task order.   Rather than increasing the base amount each time the Government increased the funding on a task order, ACC-RI ignored the overwhelming majority of Government-issued increases in funding.   In effect, *much of Agility's approved work did not receive any fee at all*.   In addition, despite the fact that ACC-RI *failed to increase* base amounts corresponding with increased funding, it *subtracted* from the base amount when the funding on a task order was decreased.

217.    Then, for each increase in funding ACC-RI did not ignore, it subtracted 5% of that amount under the erroneous assumption that the obligated funding included the fee amount. Under FAR 52.232-22, which was incorporated into the Contract, the obligated funding was "exclusive of any fee."

218.    Through its erroneous calculations, ACC-RI established fee pools that were sometimes *less than half its recommended costs*.

219.    Finally, without any apparent reason other than to recommend the least amount of fee possible for "negotiation" purposes, ACC-RI applied the 5% fee to the calculated fee pool for three of the task orders but applied the 5% fee to its own recommended costs for three others. Thus, the "base amounts" determined by ACC-RI were derived from its recommended costs for half the task orders but derived from the fee pool for the other half.   ACC-RI provided no justification for this arbitrary determination of base amounts.   From the table below, however, it is apparent that in all but one case, ACC-RI simply chose the lower of the fee pool amount or the recommended cost amount for purposes of setting a base amount.

| Task Order | Fee Pool | Recommended Costs | Base Amount |
|---|---|---|---|
| 3 – Transportation | $69,250,652.09 | $148,621,629.60 | Fee pool |
| 6 –Security | $27,431,842.00 | $14,673,387.29 | Recommended costs |
| 9 – Warehouses | $20,745,080.00 | $44,656,953.34 | Fee pool |
| 15 - Transportation | $33,012,200.00 | $32,941,789.00 | Recommended costs |
| 17 – Warehouses | $17,633,556.44 | $16,935,578.19 | Fee pool |
| 20 – Closeout | $27,179,833 | $27,071,592.00 | Recommended costs |

Funding Limits

220.    The Contracting Officer disallowed all of Agility's costs and fees that, according to the Government, exceeded the funding limits of several of the task orders.

221.    Agility's claims in this Complaint include costs that exceed the funding limits of Task Orders 3, 9, 11, 12, 16, 17, and 20.

222.    The Contracting Officer's reliance on the funding limits was arbitrary and capricious because the Government, due to the exigent circumstances, expected and demanded that Agility continue performance of the task orders regardless of funding.  *See supra* ¶¶ 135-45.

223.    The Government neither directed Agility to stop work once a funding ceiling was reached or about to be reached, nor directed Agility to reduce its scope of work to bring its operations in line with available funding.  Quite the opposite, the Government explicitly and

implicitly directed Agility to continue performance of the task orders even after receiving notification from Agility that the funding limits were nearly or already exceeded.

224.    The Government's "business as usual" approach induced Agility to continue performance, with the reasonable belief that it would recover costs incurred over the current funding limits.  Agility in good faith continued performance in reliance on the assurances from the Contracting Officers that it would be reimbursed, effectively waiving the funding limits.

225.    The table below summarizes Agility's certified claim and the Government's claim amounts per task order.  These amounts include direct costs, indirect costs, and fees.

| Task Order | Agility Certified Claim | Government Claim | Amount in Dispute |
|---|---|---|---|
| 3 – Transportation | $9,348,847.03 | $30,842,462.10 | $39,048,856.11* |
| 6 – Security | $3,149,878.96 | $37,072,284.03 | $40,222,162.99 |
| 9 – Warehouses | $18,395,595.61 | $7,416,886.66 | $25,777,661.27* |
| 10 – Khor Az Zubayr | $32,761.77 | $257,049.04 | $289,810.81 |
| 11 – Tadji | $294,513.14 | $18,046.56 | $312,559.70 |
| 12 – Khor Az Zubayr | $1,112,497.14 | $130,063.69 | $1,242,560.83 |
| 14 – Refurbish Abu Ghraib | $41,161.99 | $30,886.97 | $72,048.96 |
| 15 – Transportation | $1,522,936.95 | $1,594,585.69 | $3,117,522.64 |
| 16 – Tadji | $66,304.31 | $0.00 | $66,304.31 |
| 17 – Warehouses | $8,623,969.48 | $697,978.25 | $9,321,947.73 |
| 18 – Security | $132,239.40 | $1,640,211.73 | $1,772,451.13 |
| 19 – Retrograde | $87,602.77 | $907,358.11 | $994,960.88 |
| 20 – Closeout | $4,387,924.43 | $222,492.79 | $4,552,627.72* |
| **Total** | **$47,196,232.98**** | **$80,830,305.62** | **$126,791,475.08*** |

    * The amount in dispute is not the sum of Agility's certified claim and the Government's claim due to questioned costs that Agility agrees are unallowable, as well as costs reallocated to different task orders.

    ** This figure is slightly more than the amount sought in Agility's April 19, 2011 certified claim due to an immaterial, $27 discrepancy regarding the amount the Government has paid Agility. *See supra* ¶ 169.

## CLAIM FOR RELIEF:  VIOLATION OF 5 U.S.C. § 706(2)(A), (D)

226.    Agility incorporates by reference the preceding paragraphs of this Complaint.

227.    The Contracting Officer's September 23, 2010 unilateral-definitization decisions for Task Orders 3, 6, 9-12, and 14-20, and his demands for repayment under those task orders, were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), and were imposed without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D).  As explained above, *see supra* ¶ 165, although Agility agrees with a small portion of the Contracting Officer's disallowances, Agility challenges $79,595,242.10 of the Government's $80,830,305.62 overpayment claim.

228.    The Contracting Officer's December 15, 2011 denial of Agility's April 19, 2011 certified claim was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

229.    The Defendants' actions in offsetting—or making available for offsetting— Agility's claimed debts against amounts owed to Agility under other Government contracts were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), and were imposed without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that this Court:

(1) Declare unlawful and set aside

    (a) The Contracting Officer's September 23, 2010 unilateral-definitization decisions for Task Orders 3, 6, 9-12, and 14-20, and his claims that Agility had been

overpaid under those task orders (except for the $1,235,063.52 of the Government's overpayment claim that Agility does not challenge);

(b) The Contracting Officer's December 15, 2011 denial of Agility's April 19, 2011 certified claim; and

(c) The Defendants' actions in offsetting—or making available for offsetting— Agility's claimed debts against amounts owed to Agility under other Government contracts.

(2) Enjoin Defendants

(a) From enforcing the Contracting Officer's September 23, 2010 unilateral-definitization decisions for Task Orders 3, 6, 9-12, and 14-20, and his claims that Agility had been overpaid under those task orders (except for the $1,235,063.52 of the Government's overpayment claim that Agility does not challenge);

(b) To pay Agility the $47,196,232.98 in additional payments, plus interest, to which it is entitled under Task Orders 3, 6, 9-12, and 14-20; and

(c) To pay Agility the approximately $17,221,029.09, plus interest, that the Government has wrongfully collected by offsetting payments owed to Agility under the DDKS Contract.

(3) Award Agility its reasonable fees, costs, expenses, and disbursements, including attorney's fees as may be permitted by law.

(4) Grant Agility such additional relief as the Court may deem just and proper.

RESPECTFULLY submitted this 14th day of September, 2016.

<div style="margin-left: 40%">

*/s/ John P. Elwood*
John P. Elwood (D.C. Bar No. 452726)
  *Counsel of record*
Michael R. Charness (D.C. Bar No. 289322)
Joshua S. Johnson (D.C. Bar No. 1018697)
Elizabeth Krabill McIntyre (D.C. Bar No. 1009657)
VINSON & ELKINS L.L.P.
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6500
Facsimile: (202) 639-6604
jelwood@velaw.com

</div>